# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Michelle P.,<br><br>               Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social<br>Security,<br><br>               Defendant. | Case No. 17-cv-4286 (HB)<br><br><br><br>**ORDER** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Michelle P. seeks review of the Acting Commissioner of Social Security's (the "Commissioner") denial of her application for disability insurance benefits ("DIB").[1] *See* (Compl. [Doc. No. 1 at 1].[2])  The parties filed cross-motions for summary judgment.  (Mot., "Pl.'s Mot. for Summ. J." [Doc. No. 15]; Def.'s Mot. for Summ. J. [Doc. No. 20].)  For the reasons set forth below, the Plaintiff's Motion for Summary Judgment is denied and the Commissioner's Motion for Summary Judgment is granted.

---

[1]  The Social Security Administrative Record ("R.") is available at Doc. No. 11.
[2]  The Complaint requests review "of the Commissioner of Social Security denying Plaintiff's Application for Social Security Disability and or Supplemental Security Income Benefits, for lack of disability," *see* (Compl. at 1), but the administrative record is clear that Plaintiff sought DIB only.  *See, e.g.*, (R. 53, 62, 73.)

# I.    BACKGROUND

## A.    Procedural History

Plaintiff filed for DIB on February 22, 2014.  (R. 53.)  Plaintiff alleged she was

unable to work as a result of rheumatoid arthritis, migraine headaches, Raynaud's

Disease, "auto-immune diseases," tachycardia, and polycystic ovary syndrome, and

asserted an alleged onset date ("AOD") of July 26, 2009.[3]  *See, e.g.*, (R. 10, 53–54, 173,

199.)  Plaintiff's "date last insured" for DIB purposes was December 31, 2014.[4]  *See*

(R. 10, 12, 173).  Plaintiff's application was denied initially and on reconsideration, and

she requested a hearing before an administrative law judge ("ALJ").  The hearing was

convened on August 2, 2016.  (R. 29–51.)  Plaintiff and vocational expert Jesse Ogren

testified.

The ALJ issued an unfavorable decision on September 20, 2016.  (R. 7–22.)

Pursuant to the five-step sequential evaluation procedure outlined in 20 C.F.R.

§ 404.1520(a), the ALJ first determined that Plaintiff had not engaged in substantial

gainful activity since at least her AOD of July 26, 2009.  (R. 12.)  At step two, the ALJ

---

[3]  Some places in the record suggest that the AOD was July 1, 2009.  *See, e.g.*, (R. 62.)
Neither party challenges the July 26, 2009 AOD or suggests that the difference between
the two dates is significant to the outcome, and so the Court uses the AOD of July 26,
2009, in this opinion.

[4]  "The date last insured (DLI) is the last day of the quarter a claimant meets insured
status for disability or blindness.  For Title II Disability Insurance Benefit (DIB) claims,
adjudicators cannot establish onset after the DLI."  SSA POMS DI 25501.320.  This
requires the claimant to have recently worked in order to be entitled to benefits.  A
claimant must have worked 20 out of the past 40 quarters to be eligible for DIB.  *See*
SSA POMS RS 00301.101-00301.800 (computing date last insured).  Put another way,
the date of last insurance is the last date an individual is eligible to receive DIB in view of
her earnings record.  Thus, the claimant must establish disability on or before that date in
order to be entitled to DIB.

determined that Plaintiff had severe impairments of rheumatoid arthritis, migraine

headaches, patellofemoral syndrome, rotator cuff tendinopathy, tachycardia, and

connective tissue disorder with Raynaud's symptoms. (*Id.*) The ALJ found at the third

step that no impairment or combination of impairments met or medically equaled the

severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. (R. 14.)

At step four, the ALJ determined that Plaintiff had the residual functional capacity

("RFC")[5]

> to perform light work as defined in 20 CFR 404.1567(b) except no
> climbing ladders, ropes, or scaffolds, occasional climbing of ramps and
> stairs, occasional stopping, kneeling, and crouching, no crawling, no tasks
> that would specifically require the act of balancing for completion, no
> extremes of heat and cold, and no concentrated exposure to fumes, dusts,
> odors, gases, and poor ventilation, and routine repetitive types of tasks and
> instructions with no strict production rate pace such as an assembly line
> type work.

(R. 15.) The ALJ also found at step four that Plaintiff was not able to perform her past

relevant work as a cable company worker, scheduler, worker detention deputy,

audio/video teacher's aide, receptionist, or an administrative assistant. (R. 20.)

At step five, however, considering Plaintiff's age, education, work experience, and

RFC, the ALJ found Plaintiff could work in jobs that exist in significant numbers in the

national economy, including: fold machine feeder, bagger, and stuffer. (R. 21.) Thus,

the ALJ concluded that Plaintiff was not disabled. (R. 22.)

---

[5] An RFC assessment measures the most a person can do, despite her limitations.
20 C.F.R. § 404.1545(a)(1). The ALJ must base the RFC "on all relevant evidence,
including medical records, observations of treating physicians and others, and the
claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*,
390 F.3d 584, 591 (8th Cir. 2004).

Plaintiff sought review by the Appeals Council, which denied her request. (R. 1–3.) The ALJ's decision therefore became the final decision of the Commissioner. (*Id.*); *see also* 20 C.F.R. § 404.981. Plaintiff then commenced this action for judicial review.

Plaintiff contends the ALJ erred by (1) failing to afford proper weight to the opinion of Dr. McLeod, one of her treating physicians; (2) discrediting Plaintiff's subjective complaints; and (3) determining that Plaintiff had the RFC to perform "light" work. *See generally* (Mem. of Law in Supporting Pl.'s Mot. for Summ. J., "Pl.'s Mem. in Supp." [Doc. No. 14 at 15–26].)

### B.  Factual Background[6]

### 1.  Plaintiff's Background and Testimony

As of her date last insured, Plaintiff was 34 years old, and therefore a "younger person." *See* 20 C.F.R. § 404.1563(c); *see also* (R. 53.) Plaintiff has a high school education and completed vocational training in a "Firefighter/EMT Training program." (R. 200.) She worked consistently until July 2009, but has not worked since. *See, e.g.*, (R. 12, 149, 199.)

At the hearing before the ALJ, Plaintiff testified that she had stopped working as a corrections officer in July 2009 because of health-related issues. *See* (R. 31.) Specifically, she said she suffered from chronic migraines and an autoimmune disorder that affected her joints. (*Id.*) She also stated that stairs were particularly problematic as

---

[6] The Court has reviewed the entire administrative record thoroughly, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

were the long periods of being on her feet and the duration of her twelve-hour shifts. (*Id.*) Plaintiff testified that she is able to stand for "[n]o more than an hour probably." (R 40.) Furthermore, if she is required to sit for long periods, her hips and knees start to ache. (*Id.*) Her employer allowed her to go on a year of unpaid leave as she attempted to address her medical issues, but things did not improve, and Plaintiff testified that she believes her condition has worsened with the passage of time. *See* (R. 32.) Plaintiff also testified that as her condition worsened, she was no longer able to volunteer as a firefighter. (R. 34.)

When asked about light sensitivity associated with her headaches, Plaintiff testified that "light can be an onset for the headache. But once the headache [has] taken effect, light doesn't make much of a difference." (R. 33.) Plaintiff stated that fluorescent lights "will trigger [her] right away." (R. 39.) She also testified that she is sensitive to "[a]ny kind of sound" when experiencing her headaches. (R. 33.)

Regarding activities of daily living, Plaintiff testified that she lives alone in a townhome owned by her parents. (R. 34.) She stated one reason she lives in a townhome is because her condition prevents her from doing lawn work and snow removal. (*Id.*) She also stated that she lives only a few minutes from her parents in case they need to assist her when she is "very sick." (R. 34–35.) Plaintiff does not believe she requires "special assistance," but noted that she does not shower or care for her hair as much as she believes she should, due to her impairments. (R. 37.)[7] Plaintiff drives two to three

---

[7] Plaintiff completed a functional capacity report on May 18, 2014. In it, she indicated no problems with her personal care. (R. 166.) However, in a later functional capacity

times per week, but she prefers to do so during the day because "[v]ision is a little trickier" for her.  (R. 35–36.)

Plaintiff testified that her mother does most of her bulk grocery shopping, although Plaintiff will get "a few small groceries" when she picks up her prescriptions.  (R. 36.)  Plaintiff stated that she does most of the remainder of her shopping online and receives delivery right to her door so she is not required to "carry anything heavy."  (*Id.*)  She testified that her typical day is spent mostly lying in bed, watching a little TV and reading.  (R. 38.)  She only gets out of bed "every once in a while to stretch [her] legs" or get something to eat.  (*Id.*)  Prior to her disability, she cooked meals for both herself and her family.[8]  (*Id.*)  Plaintiff testified that before her disability she used to be very active: playing both the piano and guitar, drawing, riding horses, and being outside.  (R. 39.)  Currently, however, aside from reading and occasionally playing the piano, her impairments make activities "a bit difficult."  (*Id.*)  That said, she did testify later in the hearing that she rides horses every few weeks for short periods.  (R. 43.)  She testified that her friends do not come to visit because she is embarrassed about the state of her home.  (R. 40.)  She believes one of the reasons she cannot do housework is because she is not capable of prolonged lifting activity, and if she over-exerts herself, she cannot move the next day.  (R. 42.)  By way of example, she testified that she could not lift 20 or 25 pounds "for any length of time."  (*Id.*)

---

report completed on January 30, 2015, after her date of last insurance, Plaintiff indicated some exhaustion from self care.  (R. 182.)

[8]  Plaintiff was previously married and was a step-parent, but is now divorced.  *See* (R. 38–39, 375.)

## 2. Relevant Medical Evidence

### a. Tachycardia

In 2009, Plaintiff was evaluated for numerous cardiopulmonary complaints, including shortness of breath and exertional fatigue. *See, e.g.*, (R. 442–447, 470–73; *see also* R 16.)  The results of the objective tests, including an electrocardiogram and electromyography, were normal. *See, e.g.*, (R 442, 445, 472.)  In September 2009, however, she was prescribed Inderal for tachycardia.  (R. 424–25.)  Plaintiff returned again the next month complaining that the Inderal wore off too quickly at low doses, and she was prescribed an extended release formulation of the medication.  (*Id.*)  Plaintiff also received at least six follow-up electrocardiograms between 2009 and 2014, with only one test—in June 2010—indicating an elevated ventricular heart rate; the remaining tests showed no change from the 2009 baseline test. *See, e.g.*, (R. 465.)  Other test results, such as from electroencephalography, a Holter monitor, chest imaging studies, various laboratory studies, and pulmonary function testing, were also normal. *See, e.g.*, (R. 413, 414, 416, 446, 466, 470, 472.)

### b. Joint Pain Related to Autoimmune Disease

Plaintiff was seen by several doctors, including her primary care physician Thomas McLeod, M.D., and her primary rheumatologist Clement Mitchet, M.D., regarding her complaints of joint pain and fatigue and concerns about a possible autoimmune disease, with no clear findings. *See, e.g.*, (R. 341–44, 368–371, 363, 375, 388–91, 411, 416, 467.)  For example, on February 23, 2010, Adam Sawatsky, M.D., another rheumatologist in Dr. Michet's practice, opined that Plaintiff "does not meet any

rheumatologic picture for a clear diagnosis" and "does not meet any classic criteria for lupus." (R. 411.) Objective tests including an ENA panel[9] and a DNA test were also normal. (*Id.*) Later that year, it was noted that Plaintiff's joint pain was stable on her current doses of medication. (R. 391.)

In June 2010, Plaintiff was seen by Dr. Mitchet in connection with "her possible early connective tissue disease syndrome." (R. 407.) Dr. Mitchet reported that she was tolerating the medication well at the time and that there had been no "observed worsening of any inflammatory symptoms." (*Id.*)

In connection with a visit on February 15, 2011, the first time Dr. McLeod had seen Plaintiff in more than a year, he reported a normal physical examination with no evidence of active synovitis, and acknowledged that Plaintiff's "history and examination findings are not diagnostic, per se, of a defined collagen vascular disorder" but stated that her "improvement with Plaquenil therapy suggests possible evolving underlying connective tissue disorder." (R. 375–78.) Two months later, Daniel Schaffer, a physician's assistant under the supervision of Dr. Mitchet, evaluated Plaintiff. (R. 368–71.) Schaffer also noted a normal physical examination and reported that Plaintiff had responded well to a new treatment regimen and that she was feeling "100% [like] her old self." (R. 368.)

---

[9] An ENA panel is used to detect the presence of an autoimmune disorder, such as lupus or a connective tissue disease. *See, e.g.*, *Extractable Nuclear Antigen (ENA) Panel*, RheumInfo, https://rheuminfo.com/common-tests/extractable-nuclear-antigen-ena-panel/ (last visited Mar. 17, 2019).

In June 2011, Dr. McLeod noted that Plaintiff had a "working diagnosis of ill-defined connective tissue disorder (characterized by mildly positive ANA and inflammatory markers in [the] past, scattered musculoskeletal symptomatology)." (R. 366.)  In November 2011, Dr. McLeod reported that "her status has improved somewhat and stabilized (though still functionally limited) on well-tolerated Plaquenil therapy."  (R. 341.)

Throughout the relevant period,[10] Plaintiff's examinations—including imaging studies—for joint-related issues were unremarkable.  *See, e.g.*, (R. 341–44, 363, 370, 390, 411, 416–17, 467, 490.)  Other clinical notes indicate signs of impingement in both shoulders, although there was no weakness, and "borderline vasospasm in the right 3rd and left 2nd fingers," but tests were otherwise unremarkable and the examination was otherwise normal.  (R. 375, 381, 408.)  Even on those occasions when Plaintiff complained of worsening symptoms, the medical records do not indicate that she presented as being in acute distress.  *See, e.g.*, (R. 396 (giving a pain rating of 3 out of 10); R. 489 (giving a pain rating of 0 out of 10).)

---

[10]  The relevant period for DIB claims is the time between the "date of alleged onset of disability and the date she was last insured under the Act."  *Reed v. Comm'r, Soc. Sec. Admin.*, 750 F. App'x 506, 507 (8th Cir. 2019).  Evidence not within the relevant period can only "be used in helping to elucidate a medical condition during the time for which benefits might be rewarded."  *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).  Thus, the Court focuses primarily on the evidence within the relevant period, noting as needed when the evidence outside the relevant period is useful to provide context for Plaintiff's impairments.

### c.  Headaches

Both before and after her AOD, Plaintiff was evaluated for complaints of headaches by Dr. McLeod.  *See, e.g.*, (R. 458 (a March 2009 visit where it was noted she was last seen for the same issue in August of 2008).)  Plaintiff reported to Dr. McLeod that this was an ongoing issue spanning many years.  *See* (R. 459.)  In April 2009 she reported to Dr. McLeod that her pain was "3" on a scale of 1-10.  (R. 450.)  Dr. McLeod noted that she appeared in no acute distress, that her neurological examination was normal, and that her headaches had improved on Topamax.  (*Id.*)  On June 16, 2009, Plaintiff stated to Dr. McLeod that her headaches were "manageable" and she had "discontinued the Topomax."  (R. 447.)  At a visit in 2011, Dr. McLeod noted Plaintiff "appears to tolerate the bright florescent lights of the office well."  (R. 377.)

In July 2014, Plaintiff was taking Imitrex to manage her headaches.  (R. 489.)  She reported to Dr. McLeod that her Imitrex did not last through the month because her insurance provider limited her monthly doses and she could not afford more out of pocket.  (*Id.*)  Dr. McLeod also noted that Plaintiff limited her use of Excedrin.[11]

---

[11]  At the August 2008 visit, Plaintiff had told Dr. McLeod that she would get a headache every day if she did not take Excedrin, and that she would get "one or two 'big headaches' each month."  (R. 463–64.)  Dr. McLeod opined that one cause of the headaches could be related to "medication overuse" that is "superimposed on her migrainous disorder."  (R. 464.)  They discussed weaning Plaintiff off of Excedrin, (*id.*), which would seem consistent with Dr. McLeod's 2014 note that Plaintiff was limiting her use of Excedrin notwithstanding continued complaints of headaches.

#### d. Dr. McLeod's Opinions on Plaintiff's Ability to Work

In July 2009, Dr. McLeod opined that Plaintiff should not work with prisoners at the Adult Detention Center but that Plaintiff could otherwise work with restrictions that approximated a "light" level of work. *See* (R. 443; *see also* R. 17).

Dr. McLeod next opined regarding Plaintiff's ability to work following Plaintiff's February 15, 2011, visit. *See* (R. 375–78). Dr. McLeod opined that "[h]er symptoms can be quite limiting, per patient report" and that Plaintiff could not resume "active work in the Adult Detention Center," but cited no clinical findings or other bases (beyond Plaintiff's self-reported symptoms) for his opinion on work restrictions. (R. 377.)

On June 2, 2016, Plaintiff was seen by Dr. McLeod for the first time that year.[12] (R. 532.) Plaintiff stated she was not in pain during the visit and exhibited no signs of distress, and her physical examination was normal. (R. 532, 533.) After this visit, Dr. McLeod completed a medical source statement. *See generally* (R. 544.) In that statement, Dr. McLeod opined that Plaintiff was only capable of work in "2 hour stints of low intensity," working "twice a week." (*Id.*) Dr. McLeod did not explain the basis for his opinion nor did he provide additional comments. (*Id.*)

#### e. Agency Consultant Opinions

Two agency consultants each independently opined that Plaintiff was not disabled. *See* (R. 53–61, 63–71.) In support of their opinions, the agency consultants pointed to Plaintiff's activities of daily living, "[t]he location, duration, frequent and intensity of the

---

[12] In addition to visits within the relevant period, Plaintiff saw Dr. McLeod several times between 2015 and 2016. *See, e.g.*, (*id.* at 501–07, 532–34, 537–39.) These physical examinations were also normal. *See, e.g.*, (*id.* at 502, 506, 533, 538.)

individual's pain and other symptoms," as well as "[p]recipitating and aggravating factors" and further observed that Plaintiff's course of medical treatment did not suggest the limiting effects suggested by Plaintiff. (R. 57, 67.) The agency consultants also stated that Plaintiff's "symptoms [and] their impact on functioning are not supported by the totality of the evidence." (R. 58, 67–68.) One agency consultant pointed by way of example to evidence in the record that Plaintiff's treatment with medication regarding her impairments was effective. *See* (R. 56.) The other consultant cited reconsideration evaluations of Plaintiff in 2014 of that noted no problems. *See* (R. 66.) As to limitations, both consultants opined that Plaintiff was capable of occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, but that Plaintiff should never climb ladders, ropes, or scaffolds, avoid extreme cold and heat, and avoid fumes, odors, dust, and the like. *See* (R. 58–59, 68–69.)

### 3. Vocational Expert Testimony

Jesse Ogren, a vocational expert, testified before the ALJ. *See generally* (R. 44–51.) The ALJ asked Ogren whether a hypothetical person could perform any of Plaintiff's past relevant work given the above-described limitations in the RFC regarding climbing, stooping, kneeling, balancing, and exposure limitations with respect to heat, cold, fumes, dust, odors, etc. (R. 47.) Ogren opined that the hypothetical person could return to some of Plaintiff's past relevant work on the basis of the Dictionary of Occupational Titles ("DOT"), but not based on Plaintiff's description of those jobs. (*Id.*) After being asked about additional limitations in the RFC, including limitations regarding repetitive tasks and no strict production rate pace, Ogren opined that the hypothetical

person could not return to any of Plaintiff's past relevant work because the past work was "all semiskilled or better," and the additional limitations limited the hypothetical person to unskilled work only. *See* (R. 47–48.) In response to a question posed by Plaintiff's attorney, Ogren denied that someone who was limited to two-hour shifts twice per week would be capable of competitive employment activity. (R. 51.)

## II. DISCUSSION

Plaintiff asserts the ALJ's decision is erroneous for three reasons: (1) the ALJ did not give Dr. McLeod's opinions the proper weight normally accorded to opinions of a treating physician; (2) the ALJ impermissibly disregarded Plaintiff's subjective complaints; and (3) the ALJ's RFC determination that Plaintiff is capable of performing "light" work is not supported by substantial evidence. *See generally* (Pl.'s Mem. in Supp. at 15–26.)

In support of her determination of Plaintiff's RFC, including her consideration of Dr. McLeod's opinions and Plaintiff's subjective complaints, the ALJ discussed Plaintiff's activities of daily living, relatively normal physical examinations, a general lack of aggressive treatments directed to her alleged impairments, an absence of opinion by her medical providers in the relevant period that Plaintiff was unable to work, evidence of noncompliant behavior, and general lack of significant objective medical findings. *See* (R. 16–20.) In sum, the ALJ concluded that the RFC limiting Plaintiff to "light" work "is supported by the comprehensive, objective medical evidence, including the overall clinical findings and signs; claimant's courses of and responses to treatments;

the claimant's relatively high-level of independence and broad range of activities; and the expert medical opinions of the DDS physicians." (*Id.* at 20.)

For the reasons set forth in the following discussion, after careful review of the record, and particularly medical records from the relevant period between July 26, 2009, and December 31, 2014, the Court is satisfied that the ALJ did not err and that her determination is supported by substantial evidence in the record as a whole.

## A. Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). That said, the Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B. Analysis

#### 1. The Weight Given to Dr. McLeod's Opinions

Plaintiff contends the ALJ erred in her consideration of Dr. McLeod's 2016 opinion regarding Plaintiff's inability to work. Specifically, Plaintiff argues that Dr. McLeod's 2016 medical opinion is not inconsistent with the rest of Plaintiff's medical records and the ALJ should therefore have given it controlling weight. (Pl.'s Mem. in Supp. at 23–25.) But this argument ignores a fundamental element of Plaintiff's DIB claim: "[Plaintiff] has to establish her being disabled prior to the expiration of her insurance to be entitled to disability insurance benefits." *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009); *see also* 20 C.F.R § 404.130 (setting out the insurance requirements for those seeking DIB). The ALJ disregarded the 2016 medical report not only because it was inconsistent with the medical record during the relevant period, i.e., between the AOD and date of last insurance, but also because it fell outside the relevant period and described a worsening of Plaintiff's condition since the relevant period. *See* (R. 19–20.)

The Court finds the ALJ's assessment correct on both counts. First, the record plainly shows that the Dr. McLeod's 2016 opinion is inconsistent with other medical evidence from the relevant period. For example, it is at odds with other medical evidence showing Plaintiff's ailments were reasonably controlled through medication. *See, e.g.*, (R. 368–371, 377, 447.) Furthermore, it is not consistent with opinions Dr. McLeod offered during the relevant period, including his 2009 and 2011 opinions. *Compare* (R. 544) (suggesting Plaintiff was only capable of two-hour shifts, twice per week) *with* (R. 443) (stating that Plaintiff should not work with detainees but may otherwise work

with restrictions that approximated a "light" level of work), *and* (R. 377) (stating only that Plaintiff should not return to work at the Adult Detention Center.)  Moreover, the record from the interval between the 2011 and 2016 opinions does not support a substantial worsening of Plaintiff's conditions over time, and certainly not by the end of 2014.  *See, e.g.*, (R. 341–44, 363, 368–371, 370, 377, 390, 407, 411, 416–17, 465, 467, 490.)  Thus, it was reasonable for the ALJ to discount Dr. McLeod's 2016 opinion on the basis of these inconsistencies.  *See, e.g.*, *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  (alteration in original) (internal quotation marks omitted)).

Second, it is undisputed that Dr. McLeod's 2016 medical statement occurred well after Plaintiff's date of last insurance.  "Evidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be [awarded]."  *Moore*, 572 F.3d at 522 (internal quotation marks omitted).  But "evidence is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition."  *Id.* at 525.  Here, there is nothing to suggest that Dr. McLeod's 2016 medical source statement articulates an opinion he held during the relevant period or was based solely on Plaintiff's condition during that period.  The fact remains that the only opinions about Plaintiff's ability to work that Dr. McLeod provided during the relevant period are different in scope and content from the 2016 opinion to which, Plaintiff argues, the ALJ should have given

controlling weight.  The ALJ rightly disregarded Dr. McLeod's 2016 opinion for both of these reasons.  *Accord Wildman*, 596 F.3d at 964; *Moore*, 572 F.3d at 522.

As for Dr. McLeod's opinions within the relevant period, Plaintiff does not point to a specific opinion that she claims was not afforded proper weight by the ALJ.  *See* (Pl.'s Mem. in Supp. at 23–25.)  Moreover, after reviewing the record, the Court finds the weight that the ALJ gave to Dr. McLeod's opinions was supported by substantial evidence.  For example, Dr. McLeod opined in February 2011 that Plaintiff could not resume "active work in the Adult Detention Center," based on her subjective complaints. (R. at 377.)  But Dr. McLeod made this assessment despite acknowledging that Plaintiff's "history and examination findings are not diagnostic, per se, of a defined collagen vascular disorder" although her "improvement with Plaquenil therapy suggests possible evolving underlying connective tissue disorder."  (*Id.*)  Furthermore, two months later, Plaintiff was seen by Schaffer and Dr. Michet, who noted a normal physical examination and stated that Plaintiff had responded well to a new treatment regimen and was feeling "100% [like] her old self."  *See* (R. 368–371.)  The ALJ may discredit or disregard opinions that are premised upon subjective complaints absent objective findings.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.")  And, as already noted, the ALJ may disregard opinions that are inconsistent with other medical evidence in the record. *See Wildman*, 596 F.3d at 964.  Moreover, as the ALJ noted, the earlier opinions spoke only to Plaintiff's ability to do her past work at the Adult Detention Center, not to

whether she could do other work consistent with the restrictions incorporated into the RFC. (R. 17.) Consequently, the ALJ did not err in the weight she gave, or chose not to give, Dr. McLeod's opinions.

### 2. The ALJ's Credibility Determination Regarding Plaintiff's Subjective Complaints

Plaintiff asserts that the ALJ improperly discounted Plaintiff's subjective complaints because she failed to specify how they were inconsistent with the record as a whole. *See* (Pl.'s Mem. in Supp. at 21–23.) Specifically, Plaintiff takes exception to the ALJ's conclusion that Plaintiff is capable of living independently, and argues that this incorrect assessment of her activities of daily living contributed to the ALJ's discounting of her subjective complaints. (*Id.* at 20, 23 (citing R. 18).)

In her decision, the ALJ found that "the claimant was able to live independently in her townhome, attend to her personal care needs, drive a car, shop in stores and by computer, run errands to the pharmacy, take care of a pet dog, ride her horse, prepare frozen meals, do some housework, manager her personal finances, watch television, listen to music, . . . play the piano, and interact with others in person and by telephone." (R. 18.) The record demonstrates that that Plaintiff *can* do those things, although perhaps not to the extent one might infer from the ALJ's description. *See e.g.*, (R. 165–72.) For instance, in Plaintiff's 2014 functional capacity report, she lists several ways in which she leans on others to help her shop, care for her pet, and take care of household chores, or is otherwise limited when it comes to living independently. *See, e.g.*, (R. 166–68.) This is consistent with her testimony. *See, e.g.*, (R. 34–39.) Thus, Plaintiff argues, the manner

in which the ALJ described Plaintiff's activities suggests that the ALJ had concluded, contrary to the record, that Plaintiff could and did perform these tasks without limitation.

Significantly, however, the ALJ incorporated a number of limitations into the RFC that reflect and are consistent with Plaintiff's testimony about her activities of daily living. (R. 15, 18–19.) Thus, at most, the ALJ's characterization of those activities appears to be a deficiency in opinion writing, and not reversible error. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) ("[A]n arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision." (internal quotation marks omitted) (alterations in in original)).

This conclusion is reinforced by the manner in which the ALJ considered Plaintiff's subjective complaints overall. It is well-established that an ALJ must consider several factors in evaluating a claimant's subjective symptoms, in addition to whether the symptoms are consistent with the objective medical evidence. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). These factors include the claimant's daily activities; work history; intensity, duration, and frequency of symptoms; side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5. The ALJ need not explicitly discuss each factor, *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005), however, and a court should defer to the ALJ's findings when the ALJ expressly discredits the claimant and provides good reasons for doing so. *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

Here, the ALJ considered "the objective medical evidence, examinations, observations made by providers, the courses of treatment, [and] medications" to conclude that Plaintiff's impairments were not as disabling as alleged. (*Id.* at 16.) For example, when discussing Plaintiff's subjective complaints, the ALJ observed that her medical record is largely comprised of normal test results and physical examinations, despite Plaintiff's alleged impairments. *See generally* (R. 16–18). She correctly noted that "after 2011, the record reflects [Plaintiff's] visits were less frequent,"[13] and in discussing Plaintiff's complaints of headaches observed that "there are no neurological visits or reports from the years 2012 to 2014, and the medical records do not support the claimant's allegedly debilitating headaches occurring 10 to 15 times a month." (R. 18.)[14] The ALJ also cited the various places in the medical record from the relevant period in which Plaintiff's providers stated that her course of medical treatment—particularly with medications—was adequately managing her conditions. *See, e.g.*, (R. 17 (stating "Dr. McLeod noted that claimant's headaches had improved on Topamax"); (R. 18 (stating "claimant's arthralgias were maintained by hydroxychloroquine, and she was rarely given an increased dose of prednisone," and, referring to a subsequent treatment

---

[13]  Indeed, there appear to be *no* treatment records pertaining to any of Plaintiff's alleged impairments during the years 2012 and 2013.

[14]  The ALJ also called attention to the reference in Dr. McLeod's February 15, 2011, notes that Plaintiff "appears to tolerate the bright florescent lights of the office well." *See* (R. 17, 377). Plaintiff testified at the hearing that fluorescent lights "will trigger [her] right away." (R. 39.)  The ALJ may discount subjective complaints where they are contradicted by the medical record. *See Turpin v. Colvin* 750 F.3d 989 (8th Cir. 2014) (stating that the inconsistencies between the claimant's testimony and the medical record supported the ALJ's decision to discount claimant's credibility).

note, that her "connective tissue disorder was doing reasonably well objectively despite her continued complaints").)[15]

Thus, even if the Court agreed the ALJ mischaracterized Plaintiff's activities of daily living (which it does not), they were but one aspect of the ALJ's credibility determination. (*Id.* at 16–20.) The other aspects of the ALJ's credibility determination are both supported by substantial evidence and proper under the law. In addition to the absence of clinical findings in the medical records to support the full extent of Plaintiff's subjective complaints, the ALJ also referenced an instance where Plaintiff had not been medically compliant. *See* (R. 17 ("In December 2009, the claimant admitted she had not gone to a recommended physical medicine and rehabilitation consultation and that she had not started Vivactil as instructed.")). The ALJ may discredit subjective complaints on the basis of noncompliant behavior. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001) (finding it permissible that "[t]he ALJ used the evidence of Holley's noncompliance solely to weigh the credibility of Holley's subjective claims of pain"). In addition, the ALJ's observations concerning the reduction in frequency of medical treatment for her alleged impairments after 2011, (R. 18), was another permissible basis to discount the credibility of subjective complaints in assessing disability during the relevant period. *See, e.g.*, *Casey v. Astrue*, 503 F.3d 687, 693 (8th Cir. 2007) (failure to

_____

[15] *See also* (R. 368-371 (noting in April 2011 that Plaintiff had responded well to the new course of treatment and was feeling "100% [like] her old self").)

seek regular treatment is not consistent with complaints of disabling pain and citing cases).[16]

Thus, regardless of whether the ALJ may have mischaracterized Plaintiff's activities of daily living, the Court concludes the ALJ's assessment of the credibility of her subjective complaints under *Polaski* is supported by substantial evidence in the record as a whole. That is, based on the objective medical evidence, the lack of treatment between 2012 and 2014, generally conservative treatment modalities which were reportedly effective in managing her symptoms, and inconsistencies between Plaintiff's testimony and the record evidence, a reasonable mind could conclude that Plaintiff's subjective complaints at least as they pertained to the relevant period were not wholly credible and that she was not as impaired as she alleges. Thus, to the extent the ALJ erred in her assessment of Plaintiff's activities of daily living, such error was harmless in light of all of the other information in the record that supports the ALJ's credibility determination regarding Plaintiff's suggestive complaints. *See Polaski*, 739 F.2d at 1322; *cf. Moore*, 572 F.3d at 522.

### 3. The ALJ's RFC Determination

For reasons primarily related to the arguments discussed above, Plaintiff contends that "[t]he overall medical history does not support the conclusions of the ALJ that

---

[16] Although Plaintiff did not raise this point, the Court takes issue with the ALJ's suggestion that Plaintiff's reduced use of Excedrin in 2014 indicates that her headaches were not as frequent or disabling as alleged. *See* (R. 18.) As previously noted, the medical records indicate that in August 2008, Dr. McLeod had encouraged Plaintiff to wean herself off of Excedrin. (R. 464.) Nevertheless, the Court is satisfied for all of the reasons discussed herein that even if Plaintiff's limited use of Excedrin is disregarded, the ALJ's determination is supported by substantial evidence in the record as a whole.

[Plaintiff] remains incapable [sic] of light work" because "[t]here is nothing in the medical history that the ALJ could point to that contradicted [Plaintiff]'s own description of her symptoms, or the opinions of Dr. McLeod regarding her ability to work." (Pl.'s Mem. in Supp. at 19; *see also id.* at 15–21.) The Court disagrees that the ALJ's RFC determination is unsupported by substantial evidence in the record as a whole. First, as discussed above, the ALJ did not err when she declined to credit Dr. McLeod's 2016 opinion that Plaintiff was incapable of working, and Plaintiff points to no error in the ALJ's failure to give weight to Dr. McLeod's earlier opinions. Second, the Court has also concluded that the ALJ did not err in her consideration of Plaintiff's subjective complaints.

Plaintiff also argues that the ALJ's decision finding Plaintiff incapable of past relevant work, which included work that involved a "sedentary" exertional level, necessarily makes the ALJ's determination that Plaintiff had the RFC to do "light" work clearly erroneous. *See* (*Id.* at 19, 21.) But Plaintiff's argument ignores the fact that the ALJ's finding that Plaintiff could not return to past relevant "sedentary" jobs was based on the testimony of the vocational expert in response to a hypothetical question that posited a number of other limitations in the RFC. Specifically, the vocational expert opined that Plaintiff could not work in past relevant jobs because she was limited to routine repetitive tasks, in addition to being precluded from climbing ladders, ropes, or scaffolds, crawling, tasks that require the act of balancing for completion, exposure to extremes of heat and cold, concentrated exposure to fumes, dust, odors, gases, poor ventilation, etc. *See* (R. 47–48.) Plaintiff's past relevant work had involved one or more

of these restricted activities. *See* (R. 45, 47–48.) Thus, the vocational expert opined that Plaintiff was incapable of returning to past work based not on the distinction between "light" and "sedentary" work but on other differences between semi-skilled and unskilled labor. *See* (R. 48.)

Except as discussed above, Plaintiff does not identify any other respects in which she contends the limitations in the hypothetical question propounded to the vocational expert were unsupported by substantial evidence in the record as a whole. *See Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."). The Court also notes that not only was there no opinion within the relevant period from a treating medical provider who recommended limitations or restrictions beyond those included by the ALJ in the hypothetical question to the vocational expert, but the ALJ also gave weight to the determinations of state agency consultants, who opined that Plaintiff was capable of occasionally lifting or carrying twenty pounds, frequently lifting or carrying 10 pounds, but that Plaintiff should never climb ladders, ropes, or scaffolds, avoid extreme cold and heat, and avoid fumes, odors, dust, and the like. *See* (R. 58–59, 68–69.) Plaintiff did not challenge the weight given by the ALJ to the opinions of those consultants.[17] Thus, the ALJ's conclusion that Plaintiff could perform "light" work while not being able to return

---

[17] "While . . . the opinion of a consulting physician alone generally does not constitute substantial evidence, the ALJ can decide to give weight to a consultant opinion if it is supported by her own independent review of the record." *Betts v. Colvin*, No. 14-cv-2434 (JJK), 2015 WL 2105855, at *27 (Keyes, Mag. J.) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002)).

to past relevant work that happened, *inter alia,* to be "sedentary" is supported by substantial evidence in the record as a whole. *See Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir.1999) ("A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence").

Ultimately, Plaintiff's arguments regarding the ALJ's RFC determination ask the Court to reweigh the evidence, which is not the appropriate standard of review. *See Gonzales*, 465 F.3d at 894. Accordingly, after careful review of the record, the Court is satisfied that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.

## III. CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Michelle P.'s Motion for Summary Judgment [Doc. No. 15] is **DENIED**; and

2. The Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 20] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  March 29, 2019              *s/ Hildy Bowbeer*
                                    HILDY BOWBEER
                                    United States Magistrate Judge